Slip Op. 17-106

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD.,** | |
| Plaintiff, | |
| **SOLARWORLD AMERICAS, INC.,** | |
| Consolidated Plaintiff, | **Before: Jane A. Restani, Judge** |
| v. | **Consol. Court No. 16-00157** |
| **UNITED STATES,** | Public Version |
| Defendant, | |
| **SOLARWORLD AMERICAS, INC., CHANGZHOU TRINA SOLAR ENERGY CO., LTD.,** | |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Plaintiff's motion for judgment on the agency record in countervailing duty administrative review is denied.  Consolidated plaintiff's similar motion is granted in part and denied in part.]

Dated:  August 18, 2017

Robert G. Gosselink and Jonathan M. Freed, Trade Pacific PLLC, of Washington, DC, for plaintiff and defendant-intervenor Changzhou Trina Solar Energy Co., Ltd.

Timothy C. Brightbill, Laura El-Sabaawi, and Usha Neelakantan, Wiley Rein LLP, of Washington, DC, for consolidated plaintiff and defendant-intervenor SolarWorld Americas, Inc.

Justin R. Miller, Senior Trial Counsel, International Trade Field Office, U.S. Department of Justice, Civil Division, of New York, NY, for defendant.  With him on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Lydia C. Pardini, Attorney, Office of

the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

## OPINION

Restani, Judge:  This action challenges the U.S. Department of Commerce ("Commerce")'s final results rendered in the second administrative review of the countervailing duty ("CVD") order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells"), from the People's Republic of China ("PRC"), covering the period of January 1, 2013, through December 31, 2013.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904, 46,904 (Dep't Commerce July 19, 2016) ("Final Results"); see also Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2013 at 1, PD 247 (July 12, 2016) ("I&D Memo").  Consolidated Plaintiff SolarWorld Americas, Inc. ("SolarWorld") seeks remand of the Final Results, contending that Commerce erred in finding non-use of a loan program by the respondent's U.S. customers, by averaging data sets for the benchmark price of solar glass, and in choosing not to average data sets for an ocean freight benchmark adjustment.  Consol. Pl. SolarWorld Americas, Inc.'s Mem. in Support of Its R. 56.2 Mot. for J. on the Agency R. 10–31, ECF No. 32 ("SolarWorld Br.").  Plaintiff Changzhou Trina Solar Energy Co., Ltd. ("Trina") also seeks remand of the Final Results, arguing that Commerce erred by including value added tax ("VAT") in its benchmark calculations.  Mem. in Support of Mot. of Changzhou Trina Solar Energy Co. Ltd. for J. upon the Agency R. 7–14, ECF No. 30 ("Trina Br.").  Defendant United States ("the government") contends that the Final Results are based on substantial evidence and are in accordance with law,

which contention SolarWorld joins with regards to Commerce's treatment of VAT.  Def.'s Resp.

in Opp'n to Pls.' Mots. for J. upon the Agency R. 11–35, ECF No. 37 ("Gov't Br."); SolarWorld

Americas, Inc.'s Resp. to Pl.'s Mot. for J. on the Agency R. 6–14, ECF No. 35 ("SolarWorld

Resp.").  For the reasons stated below, the court sustains the <u>Final Results</u> in part, but remands

for Commerce to reconsider its data selection for solar glass.

## BACKGROUND

"In order for Commerce to assess countervailing duties upon investigation of a subsidy, it

must find that the subsidy is one in which an authority 1) provides a financial contribution to a

person, 2) a benefit is thereby conferred, and 3) the subsidy is specific."  <u>Bethlehem Steel Corp.</u>

<u>v. United States</u>, 26 CIT 1003, 1009, 223 F. Supp. 2d 1372, 1378 (2002); <u>see</u> 19 U.S.C.

§ 1677(5)(A)-(B).  A benefit may arise in a variety of ways, including, at issue here, "in the case

where goods or services are provided [to a respondent by a foreign government], if such goods or

services are provided for <u>less than adequate remuneration</u>."  19 U.S.C. § 1677(5)(E)(iv)

(emphasis added).  The adequacy of remuneration is determined by comparing the price paid by

a respondent "to a market-determined price for the good . . . resulting from actual transactions in

the country in question."  19 C.F.R. § 351.511(a)(2)(i).  This latter price is referred to as the

"benchmark."  If a price from actual transactions, referred to as a tier-one benchmark, is

unavailable, Commerce turns to a tier-two benchmark, in which Commerce "compar[es] the

government price to a world market price."  <u>Id.</u> § 351.511(a)(2)(ii).  For both tier-one and tier-

two benchmarks, "[Commerce] will adjust the comparison price to reflect the price that a firm

actually paid or would pay if it imported the product."  <u>Id.</u> § 351.511(a)(2)(iv).

In this review, Commerce investigated a single mandatory respondent, JA Solar

Technology Yangzhou Co., Ltd. and its cross-affiliated companies (collectively "JA Solar").

Final Results, 81 Fed. Reg. at 46,904.  Commerce determined the net countervailable subsidy

rate to be 19.20% ad valorem, which rate Commerce assigned to respondent Trina.  See id. at

46,905.  Relevant here, Commerce found subsidies based on the PRC's provision of several solar

cell inputs—including polysilicon, solar glass, and electricity—for less than adequate

remuneration ("LTAR").  I&D Memo at 6, 8.  For electricity, Commerce used a tier-one

benchmark, whereas for polysilicon and solar glass Commerce employed a tier-two benchmark.

See id. at 6, 16, 20, 25–26.  In calculating the benchmark price for these inputs, Commerce

included ocean freight costs (except for electricity) and an amount for VAT.  Id. at 22–27.  Also

relevant here, Commerce determined that alleged subsidies, preferential, low interest rate loans

provided by the Export-Import Bank of the PRC ("Ex-Im Bank") to U.S. purchasers of JA

Solar's solar cells through the Ex-Im Bank's Export Buyer's Credit program ("the program"),

were not actually provided to JA Solar's U.S. customers.  Id. at 10.  Both parties now make

challenges to the Final Results.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court upholds

Commerce's final results in a CVD review unless it is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

## I.     Export Buyer's Credit Program

A.     Specific Facts

In its Final Results, Commerce determined that none of JA Solar's U.S. customers used

the Ex-Im Bank's Export Buyer's Credit program, and thus, that a countervailing duty for this

program was not appropriate.  I&D Memo at 11.  Commerce noted that although the

Government of China ("GOC") failed to fully cooperate with Commerce's verification of non-use of the program by JA Solar's customers,[1] JA Solar cooperated with Commerce and submitted declarations of non-use from its U.S. customers.  Id. at 11.  Accordingly, Commerce concluded, in line with its determination in Chlorinated Isocyanurates from the People's Republic of China:  Final Affirmative Countervailing Duty Determination; 2012, 79 Fed. Reg. 56,560 (Dep't Commerce Sept. 22, 2014) ("Chlorinated Iso"), that JA Solar's declarations from its U.S. customers sufficiently established non-use of the program.  I&D Memo at 9, 11; see Countervailing Duty Investigation of Chlorinated Isocyanurates from the People's Republic of China:  Issues and Decision Memorandum for the Final Determination at 15, C-570-991 (Dep't Commerce Sept. 8, 2014), available at http://enforcement.trade.gov/frn/summary/prc/2014-22501-1.pdf (last visited August 15, 2017).  Verification of JA Solar's customers' declarations was unnecessary, Commerce stated, because no record evidence contradicted the declarations' accuracy.  I&D Memo at 11–12.

SolarWorld argues that substantial evidence does not support Commerce's determination that none of JA Solar's U.S. customers used the program.  SolarWorld Br. at 10–20; Reply Br. of Pl. SolarWorld Americas, Inc. 3–11, ECF No. 41 ("SolarWorld Reply").  SolarWorld contends that Commerce wrongly concluded all of JA Solar's U.S. customers submitted declarations, given that JA Solar's export customer list shows some customers with addresses in the United States, none of which submitted declarations.  Solar World Br. at 15–17; SolarWorld Reply at 3–

---

[1] The GOC "refus[ed] to provide all of the requested information and system access."  I&D Memo at 11.  For example, Ex-Im Bank officials searched the program's inquiry system at verification for the [[ ]] customer names provided by JA Solar to determine if loans were made to these companies.  Verification of GOC Questionnaire at 6–7, PD 224 (May 6, 2016).  But, the officials did not search for other names or consent to a search of customers with slightly different spellings or punctuation, which search arguably was necessary to conclusively establish that no customers received a loan from the Ex-Im Bank.  See id.

5. Furthermore, SolarWorld faults Commerce for "deviat[ing] from [its] practice," established in Chlorinated Iso, of verifying such declarations. SolarWorld Br. at 10, 17–18; SolarWorld Reply at 5–6. Instead of relying on the customers' declarations, SolarWorld contends, Commerce should have applied adverse facts available ("AFA") and found use of the program by JA Solar's customers. SolarWorld Br. at 14–20; SolarWorld Reply Br. at 6–11. For this argument, SolarWorld points to the GOC's failure to adequately cooperate with verification, Commerce's past practice of applying AFA when the GOC fails to verify non-use of the program by a respondent's customers, and the dangerous precedent set for future proceedings by in effect rewarding the GOC for non-cooperation. SolarWorld Br. at 10, 11–13, 19; SolarWorld Reply at 6–11.

The government responds that substantial evidence supports Commerce's conclusion that none of JA Solar's U.S. customers used the program, and that Commerce's refusal to apply AFA was proper. Gov't Br. 27–35. The government states that JA Solar provided declarations from all its U.S. customers, and that no record evidence demonstrates any other customer received a loan from the Ex-Im Bank. Id. at 28, 31–32. The government contends that the GOC's non-cooperation is irrelevant in light of the customers' declarations, and that AFA should not be used simply to punish the GOC when no party received a more favorable result than would have resulted had the GOC fully cooperated. Id. at 29–30, 35.

B.    Discussion

Commerce "shall . . . use the facts otherwise available" in reaching a determination when "an interested party . . . withholds information that has been requested by [Commerce]." 19 U.S.C. § 1677e(a)(2)(A). "[I]n selecting from among the facts otherwise available," Commerce "may use an inference that is adverse to the interests of that party" when Commerce "finds that

an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce]." Id. § 1677e(b)(1)(A).  When a foreign government fails to cooperate to the best of its ability, Commerce is permitted to apply AFA even though it "may adversely impact a cooperating party."  Archer Daniels Midland Co. v. United States, 917 F. Supp. 2d 1331, 1342 (CIT 2013).  Commerce should, however, "seek to avoid such impact if relevant information exists elsewhere on the record."  Id.  Commerce is afforded a significant amount of discretion in choosing not to apply AFA.  See Husteel Co. v. United States, 98 F. Supp. 3d 1315, 1356 (CIT 2015).

Commerce's determination that none of JA Solar's U.S. customers used the program is supported by substantial evidence.  Commerce reasonably relied on JA Solar's declarations from [[ ]] of its customers to establish non-use of the program.  The fact that [[ ]] of JA Solar's customers that did not submit a declaration also have an address in the United States raises the possibility that some customers may have used the program.  See JA Solar Suppl. Questionnaire Resp. at Ex. 9, CD 56–63 (Nov. 12, 2015) (listing JA Solar's export customers).  But, SolarWorld does not identify any record evidence establishing that any of these customers used the program, or that any of them crossed the two million dollar of sales threshold apparently necessary to receive an Ex-Im Bank loan.  See SolarWorld Br. at 16 (stating that "the GOC reported that sales contracts eligible for [the program] must be for $2 million or more").  SolarWorld's citation to its own letter alleging that JA Solar was involved in the downstream construction of large solar farms is unavailing, given that the evidence only reports JA Solar's production of solar farms in the PRC, not the United States, and does not refer to any particular dollar amount.  See SolarWorld New Subsidy Allegations Letter at 6–8, PD 125 (Oct. 15, 2015).  In light of the customer declarations provided by JA Solar certifying non-use of the program and

the lack of evidence to the contrary, the mere possibility that one of JA Solar's customers

participated in the program is not enough for SolarWorld to prevail.  See Archer Daniels, 917 F.

Supp. 2d at 1331 ("Even if it is possible to draw two inconsistent conclusions from evidence in

the record, such a possibility does not prevent Commerce's determination from being supported

by substantial evidence.").[2]

Similarly, substantial evidence supports Commerce's decision not to apply AFA despite

the GOC's failure to fully comply at verification.  When "relevant information exists elsewhere

on the record," such as JA Solar's customer's declarations here, Commerce should "seek to

avoid" adversely impacting a cooperating party.  See Archer Daniels, 917 F. Supp. 2d at 1342.

SolarWorld contends that Commerce has a "prior practice" of applying AFA when the GOC

refuses to cooperate in verifying non-use of the program by a respondent's customers.

SolarWorld Br. at 18–19.  But, although Commerce has at times applied AFA in such contexts,

these prior proceedings are distinguishable by the lack of evidence in those records to fill in the

void.  See, e.g., Issue and Decision Memorandum for the Final Determination in the

Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the

People's Republic of China at 93, C-570-011 (Dec. 15, 2014), available at

http://enforcement.trade.gov/frn/summary/prc/2014-30071-1.pdf (last visited August 15, 2017)

("Unlike in [Chlorinated Iso], none of the company respondents here provided any probative

_____

[2] SolarWorld's reliance on Chlorinated Iso as establishing a "practice" requiring Commerce to
verify the declarations on record also comes up short.  A single agency decision does not create
an agency "practice."  See Huvis Corp. v. United States, 525 F. Supp. 2d 1370, 1377 (CIT 2007)
("[T]wo prior determinations [in separate administrative proceeding] are not enough to constitute
an agency practice that is binding on Commerce.") (quoting Shandong Huarong Mach. Co. v.
United States, 435 F. Supp. 2d 1261, 1282 n. 23 (CIT 2006)).  Furthermore, Commerce
adequately explained its decision not to verify the declarations in this case—no record evidence
contradicted them.  See I&D Memo at 11–12.

documents indicating non-use by unaffiliated U.S. customers . . . such as affidavits or

certifications indicating non-use of [the program].").[3]  Moreover, it would have been

inappropriate for Commerce to apply AFA for no reason other than to deter the GOC's non-

cooperation in future proceedings when relevant evidence existed elsewhere on the record.

Accordingly, Commerce's decision to refrain from applying AFA is supported by substantial

evidence.

## II.     **Solar Glass Benchmark Data**

### A.     Specific Facts

In its Final Results, Commerce calculated the world market price of solar glass, an input

of solar cells, by averaging data from IHS Technology ("IHS"), submitted by respondent JA

Solar, with data from the Global Trade Atlas ("GTA"), submitted by petitioner SolarWorld.

I&D Memo at 19; JA Solar Benchmark Submission at Ex. 3A, PD 147–60 (Nov. 2, 2015);

SolarWorld Benchmark Submission at Ex. 7, PD 144 (Nov. 2, 2015).  Commerce analyzed the

data sets' accuracy in terms of four factors:  (1) specificity to the input in question, solar glass;

(2) contemporaneity with the period of review ("POR"); (3) unit of measure; and (4) exclusivity

of taxes and PRC prices.  I&D Memo at 20–22.  As to specificity, the IHS data reported prices

---

[3] SolarWorld also notes that Commerce has applied AFA in previous proceedings at times despite the existence of customer declarations.  SolarWorld Reply at 9–11.  But, in those proceedings there were additional factors not present here.  See, e.g., Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Certain Amorphous Silica Fabric from the People's Republic of China at 61–62, C-570-039 (Jan. 17, 2017), available at http://enforcement.trade.gov/frn/summary/prc/2017-01635-1.pdf (last visited August 15, 2017) (applying AFA because, inter alia, the GOC "withheld critical information" regarding a possible revision to the program's requirements); Countervailing Duty Investigation of Certain Biaxial Integral Geogrid Products from the People's Republic of China:  Issues and Decision Memorandum for the Final Affirmative Determination at 20, C-570-037 (Jan. 4, 2017), available at http://enforcement.trade.gov/frn/summary/prc/2017-00429-1.pdf (last visited August 15, 2017) (using AFA because, among other reasons, one of two respondents did not provide a declaration, and loans may have been made by banks whose information was not on the record).

for solar glass while the GTA data gave prices for "safety glass, toughened, tempered, or other," which category included solar glass.  Id. at 21; Preliminary Results Decision Memo. at 16, PD 187 (Dec. 31, 2015).  Commerce concluded that the IHS data was more specific than the GTA data to the input in question, but rejected JA Solar's argument "that the tempered glass category is too broad to be reliable."  I&D Memo at 20–21.  As for contemporaneity, Commerce determined that the fact the GTA data reported prices on a monthly basis, whereas the IHS data only gave a single annual price, meant that the GTA data was more favorable.  Id. at 21.  Commerce noted that a single annual price could be reporting the price for the beginning of the year or the end of the year, rather than a price representative of the entire POR.  Id. at 21.  Regarding unit of measure, Commerce filtered out GTA data for prices reported in price per square meter to include data reported only in price per metric ton.  Id. at 21.  For the IHS data, all of which was reported in price per square meter, Commerce used record evidence on solar glass's density and thickness to convert the square meter price to price per kilogram ("kg").  Id. at 21–22.  Finally, Commerce concluded that the GTA data was exclusive of PRC prices and taxes, and that PRC prices could be removed from the IHS data.  Id. at 22.  As to taxes in the IHS data, Commerce noted that "there is no information indicating whether the IHS data is [] tax exclusive," but concluded without discussion that this issue did not render the IHS data unsuitable.  Id. at 22.  Commerce ultimately determined that, because both data sets had strengths and flaws, averaging the two data sets would create the most robust global benchmark for solar glass.  Id. at 22.

SolarWorld argues that Commerce's decision to average the data sets is not supported by substantial evidence, and that Commerce instead should have used only the GTA data.  SolarWorld Br. at 20–24; SolarWorld Reply at 11–14.  SolarWorld highlights the fact that the

IHS data does not report monthly prices, and notes that Commerce's preference is for monthly

prices.  SolarWorld Br. at 20–22.  In addition, SolarWorld faults the IHS data for being inclusive

of PRC prices and for not excluding taxes.  Id. at 22–23.  Lastly, SolarWorld contends that the

GTA data was not flawed on specificity because the "tempered glass" category covers the solar

glass used in photovoltaic applications.  Id. at 23.

The government responds that Commerce's decision was supported by substantial

evidence because neither data set was so flawed as to be unusable.  Gov't Br. at 11–19.  The

government focuses on product specificity as being a crucial factor in calculating an accurate

benchmark, and notes that the IHS data was superior in this regard.  Id. at 17.  On tax and price

exclusivity, the government points to the fact that Commerce removed PRC pricing from the IHS

data, but the government makes no mention of taxes.  Id. at 17–18.  The government adds no

new arguments on the other factors.

B.   Discussion

As discussed above, a "subsidy" includes the provision of "goods . . . for less than

adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  In a tier-two analysis, as here,

"[Commerce] will seek to measure the adequacy of remuneration by comparing the government

price to a world market price . . . . Where there is more than one commercially available world

market price, [Commerce] will average such prices to the extent practicable, making due

allowance for factors affecting comparability."  19 C.F.R. § 351.511(a)(2)(ii).

On this record substantial evidence does not support Commerce's decision to average the

IHS and GTA data sets.  Commerce correctly determined that the IHS data is slightly more

product specific than the GTA data, but also concluded that "[t]empered glass is a relatively

limited category," that that category contains solar glass, and that "[t]empered glass" is not so

broad a category as to be unreliable.  See I&D Memo at 20–21.  Given this conclusion in this

case specificity seems to be a minimal advantage and the GTA data appears superior.

First, the IHS data reports a single annual price, which, as Commerce noted, could be a

price either for the beginning or end of the year, or an average for the entire POR.  Id. at 21.  In a

market where prices fluctuate a meaningful amount from month to month, as here, a price

reflective of a single moment in the year could be significantly different, and less accurate, than

the average annual price.  See SolarWorld Benchmark Submission at Ex. 7 (reporting, for

example, Costa Rica monthly solar glass prices ranging from 1,487.83 U.S. Dollars per Metric

Ton ("USD/MT") to 2,210.19 USD/MT, and Ecuador prices ranging from 2,818.64 USD/MT to

1,875.07 USD/MT).  Second, Commerce itself admitted that the record is ambiguous as to

whether the IHS data is tax inclusive or exclusive, I&D Memo at 22, yet included no specific

justification for its conclusion that the IHS was usable despite this possible distortion—e.g., that

even if the IHS data is tax inclusive the GTA's specificity flaw is significant enough to warrant

averaging the data sets, or that taxes are removed only if "there is an affirmative indication of

their presence," as in the antidumping context.  See Sichuan Changhong Elec. Co. v. United

States, 30 CIT 1481, 1504, 460 F. Supp. 2d 1338, 1359 (2006).[4]  Nor does the government

attempt to explain Commerce's silence on this issue.  In such an important matter as this,[5]

---

[4] Contrary to SolarWorld's contention, the IHS data used by Commerce does not include PRC prices, given that Commerce adjusted the IHS data to exclude PRC prices.  See I&D Memo at 22; Final Results Analysis at 3, PD 248 (July 12, 2016) (stating that Commerce "[r]emoved the PRC-related data from Tables G7 and G9 [of the IHS data].");  JA Solar Benchmark Submission at Ex. 3A at 1 (listing separate solar glass prices for China, EMEA [Europe, the Middle East, and Africa], Americas, and "Rest of World").

[5] The provision of solar glass for LTAR is central to this subsidy investigation.  It is by far the most significant subsidy in this proceeding, accounting for nearly two-thirds of the 19.20% ad valorem subsidy rate.  See Final Results Analysis at Attach. 1, PD 248 (July 12, 2016).

(continued . . .)

Commerce must reconsider its choice and if it chooses to adhere to it explain why a data set that

may include taxes, may not be representative of the entire POR, and is only slightly more

product specific, should be averaged with a data set that generally lacks cause for concern.

## III.   Ocean Freight Data

###   A.   Specific Facts

In its <u>Final Results</u>, Commerce determined the ocean freight cost of shipping polysilicon

and solar glass by reference to JA Solar's data, rather than SolarWorld's data.  <u>I&D Memo</u> at

23.[6]  The two factors guiding Commerce's selection of data here were contemporaneity and

product specificity.  First, Commerce reasoned, JA Solar's data was contemporaneous with the

POR, whereas SolarWorld's was not.  <u>Id.</u> at 23–24.  Second, according to Commerce,

SolarWorld's shipping data was not specific to the inputs in question because it reflected prices

for forty-foot tanks, and "information on the record indicates that a tank's capacity is measured

in liters rather than a dry weight measure, as used for regular containers."  <u>Id.</u> at 24.  Because

solar glass and polysilicon are dry solids, Commerce concluded that SolarWorld's data lacked

---

Furthermore, averaging the IHS data with the GTA data significantly lowers the solar glass
benchmark price.  <u>See</u> Final Results Analysis at Attach. 2 at 127 (calculating the price of solar
glass derived from the IHS data to be 1.05 USD/kg and, from the GTA data, to be 4.53 USD/kg).

[6] SolarWorld's data reported prices from Maersk Line ("Maersk") for shipping "[g]lass,
glassware" and "[m]iscellaneous manufactured articles" in forty-foot tanks during the year 2012.
SolarWorld Freight Benchmark Data at Exs. 2–3, PD 137–146 (Nov. 2, 2015).  JA Solar's data,
meanwhile, was composed of two data sets.  First, JA Solar submitted the shipping data used in
an administrative review in <u>Citric Acid and Certain Citrate Salts from the People's Republic of
China</u>, 79 Fed. Reg. 77,318, 77,318 (Dep't Commerce Jan. 2, 2014) ("<u>Citric Acid</u>").  <u>See</u> JA
Solar Freight Benchmark Submission at Ex. 4B, CD 42 (Nov. 2, 2015).  This data reported prices
from Maersk for shipping various goods in twenty-foot containers, none of which were
investigated in the current proceeding, for the entire year of 2013.  <u>Id.</u>  Second, JA Solar placed
on the record Maersk prices for shipping "[g]lass, glassware" and "[b]ase metals, base metal
articles" in twenty-foot containers for only October, November, and December of 2013.  <u>See id.</u>
at Ex. 4C.  In its <u>Final Results</u>, Commerce used the <u>Citric Acid</u> data for the first nine months of
2013, and JA Solar's second data set for the final three months of the year.  <u>I&D Memo</u> at 23.

specificity.  Id. at 24.  Additionally, Commerce rejected SolarWorld's concern that the nine

months of shipping data submitted by JA Solar from Citric Acid was not specific to the inputs in

question.  Id. at 23.  Commerce reasoned that that data was trustworthy because the shipping

prices for October–December of 2013 reported in Citric Acid, which Commerce did not use,

matched the shipping prices for those months provided in JA Solar's second data set, which data

was specific to the inputs in this proceeding.  Id. at 23.

SolarWorld argues that substantial evidence does not support Commerce's decision to

use only JA Solar's data to calculate ocean freight costs, and that Commerce instead should have

averaged SolarWorld's data with JA Solar's data.  SolarWorld Br. at 24–31; SolarWorld Reply at

14–18.  Regarding contemporaneity, SolarWorld contends that its data was non-

contemporaneous but nonetheless accurate because SolarWorld used an inflator to adjust the data

to reflect POR-contemporaneous prices, and Commerce regularly allows such data inflation.

SolarWorld Br. at 27–28; SolarWorld Reply at 16–17.  As to specificity, SolarWorld faults JA

Solar's data for including ocean freight costs for calcium carbonate, caustic soda, and steam

coal—the shipped goods reported in Citric Acid—whereas the inputs in question here are

different products.  SolarWorld Br. at 30–31; SolarWorld Reply at 16–17.  Regarding its own

data, SolarWorld argues that the products reported as being shipped in forty-foot tanks were

solids, despite the data's use of the word "tank," and that no record evidence shows a typical

Chinese producer would use only twenty-foot containers as opposed to forty-foot ones.

SolarWorld Br. at 28–29; SolarWorld Reply at 17–18.

The government responds that Commerce's selection of JA Solar's ocean freight data

was supported by substantial evidence.  Gov't Br. at 19–25.  The government states that,

critically, JA Solar's data was contemporaneous with the POR while SolarWorld's was not.  Id.

at 20.  The government admits that Commerce has used non-contemporaneous data inflated to

the proper POR in past proceedings, but states that Commerce has done so only when no

contemporaneous data existed on the record, and that inflating data can lead to inaccurate results.

Id. at 20–23.  As to specificity, the government does not argue that the Citric Acid shipping data

used for the first nine months of the POR is specific to the products in question.  But, the

government contends, the fact the final three months of the Citric Acid data match the

overlapping three months from JA Solar's other data sufficiently indicates that the nine months

of Citric Acid data are reliable.  Id. at 24–25.  In addition, the government contends that

SolarWorld's data was not specific to the inputs in question because it reported shipping costs

for liquids, as indicated by a tank's capacity being measured in liters rather than kilograms.  Id.

at 23.

    B.    Discussion

In its benchmark calculations, "[Commerce] will adjust the comparison price to reflect

the price that a firm actually paid or would pay if it imported the product," such as by including

ocean freight costs.  19 C.F.R. § 351.511(a)(2)(iv); see also Preliminary Results Decision Memo.

at 31 ("Regarding delivery charges, we included ocean freight . . . .").  Because "Commerce's

regulations neither require nor preclude Commerce from averaging freight costs when adjusting

the world market benchmark for import costs . . . Commerce has broad discretion in determining

how to adjust the world market benchmark price to reflect costs incurred by purchasers so long

as it does so reasonably."  TMK IPSCO v. United States, 179 F. Supp. 3d 1328, 1350 (CIT

2016).

Commerce's selection of JA Solar's ocean freight data and concomitant rejection of

SolarWorld's data was supported by substantial evidence.  First, JA Solar's data is

contemporaneous with the POR while SolarWorld's is not.  See SolarWorld Freight Benchmark

Data at Exs. 2–4 (providing ocean freight data for the year 2012).  Although Commerce has in

past proceedings used price inflators to adjust data to be contemporaneous with the POR, the

government correctly states that Commerce does so only when there is not contemporaneous

data on the record, a point SolarWorld does not contest.  See, e.g., Prelim. Determination

Analysis for JA Solar at 8, PD 200 (Dec. 31, 2015) (using price inflators and deflators to adjust

land-use right prices to be contemporaneous with the POR when no party submitted land-use

rights benchmarks).  Commerce explains this preference for contemporaneous data by stating

that "non-contemporaneous freight rate data may have been affected by factors not present

during the POR, for example, changes in demand for freight from year-to-year, changing energy

costs, or construction of new ports, or inability to use particular ports."  Gov't Br. at 22.  Second,

as to specificity, the overlapping three months in JA Solar's two data sets indicates the accuracy

of the Citric Acid data, even though it reports shipping costs for materials other than the inputs at

issue in this proceeding.  Compare JA Solar Freight Benchmark Submission at Ex. 4B (providing

the underlying shipping data used in Citric Acid), with id. at Ex. 4C (providing shipping data for

October–December of 2013).[7]  Because JA Solar's data is contemporaneous and has no

---

[7] Indeed, shipping costs do not appear to vary at all based on the particular type of cargo shipped.
For instance, the shipping data in Citric Acid for October, November, and December of 2013, for
shipping "[s]alt, sulphur, earths and stone, plastering materials, lime, cement, marble, granite"
from Los Angeles to Shanghai, reported prices of $1,020.34, $1,020.58, and $1,100.63,
respectively.  JA Solar Freight Benchmark Submission at Ex. 4B at 17–19.  The data for the final
three months of 2013 submitted by JA Solar for shipping "glass, glassware" from Los Angeles to
Shanghai, meanwhile, reported exactly the same prices of $1,020.34, $1,020.58, and $1,100.63.
Id. at Ex. 4C at 55, 57, 59.  This is of little surprise, given that both the Citric Acid data and JA
Solar's second data set report the cost of shipping 28,000 kg of the various goods in twenty-foot
containers.  See id. at Exs. 4B, 4C.

(continued . . .)

specificity concerns, whereas SolarWorld's data suffers from, at the very least, contemporaneity

issues, substantial evidence supports Commerce's selection of only JA Solar's data to calculate

ocean freight costs.

## IV.    Value Added Tax

### A.    Specific Facts

In its <u>Final Results</u>, Commerce increased the tier-two benchmark prices for polysilicon

and solar glass to reflect the VAT that a hypothetical PRC firm would pay upon importing these

products.  In addition, Commerce chose not to exclude any amount for VAT from the electricity

tier-one benchmark price.  <u>I&D Memo</u> at 26.  Commerce justified its decision to account for

VAT by reference to 19 C.F.R. § 351.511(a)(2)(iv), quoted in full below.  <u>Id.</u> at 25–26.

Commerce reasoned that the regulation "require[s] [Commerce] to consider all adjustments

necessary to ensure an accurate comparison . . . not limited to delivery charges and import

duties."  <u>Id.</u> at 26.  Commerce clarified this understanding by stating that VAT should be

included in benchmark prices "[a]s long as VAT is reflective of what an importer would have

paid."  <u>Id.</u>  Commerce rejected JA Solar's contention that VAT should be excluded from the

---

The record is less clear, however, on whether SolarWorld's data suffers from specificity concerns.  Commerce correctly notes that SolarWorld's data for "[g]lass, glassware" and "[m]iscellaneous manufactured articles," obtained from Maersk, reports prices for "Type [of container]: Tank," "Size: 40'."  <u>See</u> <u>I&D Memo</u> at 24; SolarWorld Freight Benchmark Data at Exs. 2–3.  But, this data is silent on whether the prices are reported by weight or by volume, unlike JA Solar's data, which specifies that the prices reported are for shipping 28,000 kg of the particular goods listed.  <u>See</u> SolarWorld Freight Benchmark Data at Exs. 2–3; JA Solar Freight Benchmark Submission at Exs. 4B, 4C.  Commerce cites Exhibit 1 of the SolarWorld Freight Benchmark Data as evidence that Maersk forty-foot tanks report prices for liquids.  <u>See</u> <u>I&D Memo</u> at 24.  But, while a description of "[t]ank container[s]" from a <u>different</u> website indicates that tanks are for shipping liquids, <u>see</u> SolarWorld Freight Benchmark Data at Ex. 1 at 10–12, the Maersk data in Exhibit 1 refers only to forty-foot <u>containers</u> for shipping dry freight, <u>see</u> SolarWorld Freight Benchmark Data at Ex. 1 at 3, 4–5.  Even if SolarWorld's data reports prices for shipping solids, however, Commerce's selection of only JA Solar's data is supported by substantial evidence.

benchmarks because VAT is later recouped by PRC firms by stating that 19 C.F.R.

§ 351.511(a)(2)(iv) "does not contemplate future reimbursements or refunds of taxes, but instead

requires us to evaluate the purchases in the form in which they are made." Id. at 26.  On the

record of this proceeding, Commerce concluded that importers would pay VAT on the tier-two

products, and that there was insufficient evidence as to whether the electricity prices included

VAT.  Id. at 26–27.

Trina argues that Commerce's decision to factor VAT into the benchmark price of

polysilicon and solar glass, and to not exclude it for electricity, is not in accordance with law.

Trina Br. at 7–14; Reply Br. of Pl. Changzhou Trina Solar Energy Co., Ltd. 1–9, ECF No. 38

("Trina Reply").  Trina contends that 19 C.F.R. § 351.511(a)(2)(iv), the regulation Commerce

relied on in justifying its treatment of VAT, prevents Commerce from including any adjustment

other than delivery charges and import duties, because the regulation lists these and does not

explicitly state that other adjustments are allowed.  Trina Br. at 9–11; Trina Reply at 2–4.

Accordingly, Trina states, because VAT is neither a delivery charge nor an import duty,

Commerce cannot add it into the benchmark calculations.  Trina Br. at 9–10.  Trina argues

further that Commerce's interpretation is unreasonable because Chinese firms later recoup VAT

when they re-sell or export the product, and because including VAT upwardly distorts

benchmark prices.  Trina Br. at 11–14; Trina Reply at 8.

The government and SolarWorld argue that Commerce's inclusion of VAT in the

calculation of benchmarks prices was in accordance with law.  Gov't Br. at 25–27; SolarWorld

Resp. at 6–14.  Both note that the regulation requires Commerce to include delivery charges and

import duties in benchmark calculations, but contend that Commerce is not prevented from also

making other adjustments.  Gov't Br. at 26–27; SolarWorld Resp. at 8–9.  In addition, both posit

that the fact a firm may eventually recoup VAT is irrelevant given that the benchmark price is to

be calculated "[a]t the time of purchase."  Gov't Br. at 27; SolarWorld Resp. at 11–12.  Lastly,

the government and SolarWorld argue that the relevant inquiry for whether or not to include

VAT is whether a hypothetical firm would pay it, not what the respondent actually paid, and that

there is evidence Chinese firms pay VAT on the inputs in question.  Gov't Br. at 25–26;

SolarWorld Br. at 9–11.

      B.     Discussion

      The regulation at issue, 19 C.F.R. § 351.511(a)(2)(iv), states simply that "[i]n measuring

adequate remuneration under [tier-one or tier-two analysis], [Commerce] will adjust the

comparison price to reflect the price that a firm actually paid or would pay if it imported the

product.  This adjustment will include delivery charges and import duties."  "When an agency

interprets its own regulation, the Court, as a general rule, defers to it 'unless that interpretation is

plainly erroneous or inconsistent with the regulation.'"  Decker v. N.W. Envtl. Def. Ctr., 568

U.S. 597, 613 (2013) (quoting Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 209 (2011)).

But, "deference is warranted only when the language of the regulation is ambiguous."

Christensen v. Harris Cty., 529 U.S. 576 (2000).

      Commerce's interpretation of 19 C.F.R. § 351.511(a)(2)(iv) to permit inclusion of

expenses other than delivery charges and import duties in benchmark calculations is not "plainly

erroneous or inconsistent with the regulation."  See Decker, 568 U.S. at 613.  The regulation

mandates that Commerce "will adjust the comparison price to reflect the price that a firm

actually paid or would pay if it imported the product."  19 C.F.R. § 351.511(a)(2)(iv).  To

interpret the regulation as requiring Commerce to adjust benchmark prices only for delivery

charges and import duties would render this mandate meaningless—the regulation, in such case,

should instead state simply that "[Commerce] will adjust the comparison price . . . [to] include

delivery charges and import duties." This interpretation, however, is to be avoided. See Mass.

Mut. Life Ins. Co. v. United States, 782 F.3d 1354, 1365 (Fed. Cir. 2015) ("When construing a

regulation, the court applies the same interpretive rules it uses when analyzing the language of a

statute."); Telecare Corp. v. Leavitt, 409 F.3d 1345, 1353 (2005) ("[C]ourts should be 'reluctant

to treat statutory terms as surplusage in any setting'") (quoting Duncan v. Walker, 533 U.S. 167,

174 (2001)). At the very least, the regulation is ambiguous as to whether other adjustments are

permitted because the final sentence of 19 C.F.R. § 351.511(a)(2)(iv) does not explicitly limit

adjustments to, or expand them beyond, the two listed. In light of this ambiguity, Commerce's

interpretation was reasonable given the regulation's mandate to "adjust the comparison price"

and the lack of language limiting adjustments to the two examples provided.

The fact Commerce reasonably interpreted its regulation to permit the addition of more

than just delivery charges and import duties to benchmark prices does not necessarily mean,

however, that Commerce reasonably read the regulation as allowing the addition of VAT. 19

C.F.R. § 351.511(a)(2)(iv) requires Commerce to make adjustments "to reflect the price that a

firm actually paid or would pay if it imported the product," but does not make clear whether that

includes VAT. According to Trina, VAT is not a charge that a firm "actually paid or would pay"

because firms later recoup VAT when they re-sell or export the good. See Trina Br. at 11–14;

Trina Reply at 4. Granted, this view of payment as extending beyond the time of importation is

within the realm of what the regulation could mean. But, Commerce's narrower view of

payment is not "plainly erroneous or inconsistent with the regulation"—the regulation simply

speaks of "the price that a firm actually paid or would pay if it imported the product." See 19

C.F.R. § 351.511(a)(2)(iv). VAT fits that bill because importers must make an initial outlay of

funds to pay VAT, a point Trina does not challenge.[8]   Because Commerce's view that possible

later recoupment of VAT does not prevent VAT from being an appropriate adjustment is well

within the language of the regulation, the court defers to Commerce's construction.[9]   In this case,

given that record evidence indicates a hypothetical Chinese firm would pay VAT on the inputs in

question,[10] the court upholds Commerce's inclusion of VAT in the benchmark calculations.

---

[8] 19 C.F.R. § 351.511(b) appears to lend further support to Commerce's interpretation:

> Time of receipt of benefit.  In the case of the provision of a good or service,
> [Commerce] normally will consider a benefit as having been received as of the
> date on which the firm pays or, in the absence of payment, was due to pay for the
> government-provided good or service.

A "benefit" is calculated by comparing the price a firm pays for goods with the benchmark price.
See 19 C.F.R. § 351.511.  Because "the date on which the firm pays" for a government-provided
good will necessarily be prior to any recoupment of VAT, the regulation implies that recoupment
of VAT is irrelevant for the calculation of LTAR.

[9] Deference to Commerce is further supported by Commerce's past practice of including VAT
for PRC benchmark calculations without factoring in recoupment.  See, e.g., Issues and Decision
Memorandum for the Final Determination in the Countervailing Duty Investigation of High
Pressure Steel Cylinders from the People's Republic of China at 44, C-570-978 (Apr. 30, 2012),
available at http://enforcement.trade.gov/frn/summary/prc/2012-10954-1.pdf (last visited August
15, 2017) ("[I]n order to ensure an 'apples-to-apples' comparison between these domestic input
purchases and the world-market benchmark, our regulations require the use of delivered prices,
which include import duties and VAT. To suggest [otherwise] . . . results in a distorted benefit
calculation and is inconsistent with the requirements of 19 C.F.R. § 351.511(a)(2)(iv).").  This
conclusion is also supported by Beijing Tianhai Indus. Co. v. United States, 52 F. Supp. 3d 1351,
1372–74 (CIT 2015), where the court, although not addressing the specific recoupment argument
made here, upheld Commerce's inclusion of VAT in calculating PRC benchmark prices.

[10] The GOC indicated that it imposes a 17% VAT on solar glass and polysilicon.  GOC Initial
CVD Questionnaire Resp. at 66, 115, PD 111–14 (Sept. 18, 2015).  As for electricity, the GOC
did not adequately indicate whether it imposes VAT, thus, Commerce applied an adverse
inference and presumed that the electricity prices reported by the GOC are VAT-inclusive.  See
I&D Memo at 26.  Trina does not challenge this particular inference, only Commerce's broad
policy of using benchmarks that include VAT.  See generally Trina Br.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determinations in the <u>Final Results</u> regarding the Ex-Im Bank's Buyer's Credit Program, selection of ocean freight data, and inclusion of VAT in the benchmark calculations.  The court remands, however, for Commerce to reconsider its decision to average the IHS and GTA data in calculating the solar glass benchmark.  Commerce must not fail to take into consideration the possible inclusion of taxes in the IHS data, a factor that Commerce does not contest can affect data accuracy.  Commerce must explicitly weigh this possible flaw and the IHS data's other potential inaccuracy of reporting a single annual price, against the GTA data's defect of being slightly less specific than the IHS data.  Commerce may consider whether or not to reopen the record for further evidence, such as what type of figure, whether an average or just a single day, the IHS data reports.

Commerce shall file its remand determination with the court on or before October 17, 2017.  The parties shall have until November 16, 2017 to file objections, and the government will have until November 30, 2017, to file its response.

   /s/ Jane A. Restani   
Jane A. Restani
Judge

Dated: August 18, 2017
   New York, New York