Slip Op. 18-31

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **CHANGZHOU TRINA SOLAR ENERGY CO., LTD.,** | |
| Plaintiff, | Before: Jane A. Restani, Judge |
| **SOLARWORLD AMERICAS, INC.,** | |
| Consolidated Plaintiff, | Consol. Court No. 16-00157 |
| .v. | PUBLIC VERSION |
| **UNITED STATES,** | |
| Defendant. | |
| **SOLARWORLD AMERICAS, INC., and CHANGZHOU TRINA SOLAR ENERGY CO., LTD.,** | |
| Defendant-Intervenors. | |

**OPINION**

[Commerce's remand results in countervailing duty administrative review of crystalline silicon photovoltaic cells from the People's Republic of China sustained.]

Dated: March 27, 2018

Robert Gosselink, Jarrod Goldfeder, and Jonathan Freed, Trade Pacific, PLLC, of Washington, DC, for Plaintiff and Defendant-Intervenor Changzhou Trina Solar Energy Co., Ltd.

Timothy Brightbill and Usha Neelakantan, Wiley Rein, LLP, of Washington, DC, for Consolidated Plaintiff and Defendant-Intervenor SolarWorld Americas, Inc.

Justin Miller, International Trade Field Office, U.S. Department of Justice, of New York, NY, for defendant. Of counsel on the brief was Lydia Pardini, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

**Restani, Judge:** Before the court are the U.S. Department of Commerce ("Commerce")'s Final Results of Redetermination Pursuant to Court Remand from Commerce's second administrative review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells") from the People's Republic of China ("PRC"). ECF No. 49 (confidential version) ("Remand Results"). See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2013, 81 Fed. Reg. 46,904 (Dep't Commerce July 19, 2016) ("Final AR Results"). This court having previously remanded the Final AR Results for Commerce to reassess its decision to average certain data sets in calculating a benchmark for solar glass, Changzhou Trina Solar Energy Co., Ltd. v. United States, 255 F. Supp. 3d 1312 (CIT 2017) ("Changzhou"), SolarWorld Americas, Inc. ("SolarWorld") now contends that Commerce's decision to continue averaging those data sets is unsupported by substantial evidence or otherwise not in accordance with law. The court sustains Commerce's Remand Results for the reasons which follow.

## BACKGROUND

The court presumes familiarity with the facts of the case as discussed in Changzhou, 255 F. Supp. 3d at 1314–16; however, the facts relevant to the Remand Results are summarized below for ease of reference.

Commerce's Final AR Results determined a countervailable subsidy rate of 19.20 percent ad valorem for subject solar cells produced by both named respondents and other companies not individually examined. Final AR Results, 81 Fed. Reg. at 46,905. Of this, 12.97 percent was meant to countervail the provision of solar glass for less than adequate remuneration ("LTAR").

<u>Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2013</u>, C-570-980, POR 01/01/2013-12/31/2013, at 8 (Dep't Commerce July 12, 2016) ("<u>Final I&D Memo</u>"). Pursuant to 19 U.S.C. § 1677e(a)(1), Commerce based part of its countervailability determination regarding the PRC's provision of solar glass on "facts otherwise available," and employed a tier-two benchmark in calculating respondent's benefit from the program. <u>Final I&D Memo</u> at 18–20. <u>See also</u> 19 C.F.R. § 351.511(a)(2)(ii).

This tier-two benchmark was established by averaging data from Information Handling Services Technology ("IHS"), submitted by respondent JA Solar, <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules from the People's Republic of China: Benchmark Submission</u>, C-570-980, POR 01/01/2013-12/31/2013, at Ex. 3A (Dep't Commerce Nov. 2, 2015) ("2014 IHS Report"), with data from the Global Trade Atlas ("GTA"), submitted by petitioner SolarWorld, <u>Certain Crystalline Silicon Photovoltaic Products, Whether or Not Assembled Into Modules, from the People's Republic of China: Submission of Factual Information - Benchmark Data</u>, C-570-980, POR 01/01/2013-12/31/2013, at Ex. 7 (Dep't Commerce Nov. 2, 2015) ("GTA Data"). <u>Final I&D Memo</u> at 22. In the decision below, SolarWorld challenged Commerce's decision to average both datasets for its <u>Final AR Results</u>, contending that Commerce should have instead relied exclusively upon GTA data. <u>Changzhou</u>, 255 F. Supp. 3d at 1320. Although the court sustained the <u>Final AR Results</u> in other respects, it remanded the results for Commerce to "reconsider its choice [to calculate its average using IHS data,] and if it chooses to adhere to it explain why a data set that may include taxes, may not be

**PUBLIC VERSION**
Court No. 16-00157                                                                                          Page 4

representative of the entire POR, and is only slightly more product specific, should be averaged with a [GTA] data set that generally lacks cause for concern." Id. at 1321.

On remand, Commerce recalculated its countervailing subsidy rate, increasing it to 24.66 percent ad valorem, with 18.43 percent meant to countervail the PRC's provision of solar glass for LTAR. Remand Results at 6. Commerce continued to average IHS and GTA data. Id. at 16. The change in rate was the result of Commerce's sua sponte adjustment of its calculation method "to conform with [Commerce's] standard monthly benchmark calculation methodology." Id. at 5, 24. No party has challenged this aspect of Commerce's recalculation, Consolidated Plaintiff SolarWorld Americas, Inc.'s Comments on the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Remand, ECF No. 53, at 7 (confidential version) ("SolarWorld Cmts."), which appears to be a reasonable adjustment.[1] The only issue before the court is thus

---

[1] Commerce stated that:

> while the Department [of Commerce] used the monthly GTA data in its original benchmark calculation, we used that data to calculate a single average value for the entire POR (essentially converting the monthly data into an annual data point), averaged the resulting single value with the single IHS annual value, and then added monthly delivery charges. Thus, the original benchmark calculation eliminated the monthly variation in the GTA data, such that the variation among the calculated monthly benchmark values was solely the result of the monthly delivery charges. Such a calculation is inconsistent with the Department's stated practice to calculate separate monthly averages when possible. Therefore, we recalculated the solar glass benchmark by calculating monthly averages of the GTA data, averaging the result for each month with the single IHS value for the year, and then adding monthly delivery charges. That is, we calculated a monthly average of the GTA data for January 2013, averaged that value with the single IHS value for 2013, and then added monthly delivery charges for January 2013 to reach a January 2013 benchmark; we repeated this calculation for each month of 2013. When calculated in this manner, the monthly benchmark values varied as a

(continued . . .)

whether Commerce's decision to continue using IHS data in its benchmark calculations is supported by substantial evidence and in accordance with law.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). Commerce's final results in a countervailing duty investigation are upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

Before assessing a countervailing duty, Commerce must establish, <u>inter alia</u>,[2] that a benefit was conferred. 19 U.S.C. § 1677(5)(A)–(B). A foreign government's provision of goods to a respondent for LTAR constitutes a benefit. 19 U.S.C. § 1677(5)(E)(iv). Here, the good in question is solar glass, provided by the PRC. The adequacy of remuneration is calculated by comparing the price paid by respondent to a market-determined price. 19 C.F.R. §

---

    result of monthly fluctuations in the GTA data, as well as monthly fluctuations in the delivery charges.

<u>Remand Results</u> at 24. <u>See</u> <u>Remand of 2nd (2013) Administrative Review of the Countervailing Duty Order on Solar Cells from the PRC: Revised Calculation of Solar Glass Benchmark</u>, C-570-980, POR 01/01/2013-12/31/2013, at Attach. II, pages 55–56 (Dep't Commerce October 20, 2017).

[2] On remand, the concept of a "benefit" is the only element of the countervailable subsidy definition at issue.

**PUBLIC VERSION**
Court No. 16-00157                                                                                                    Page 6

351.511(a)(2).[3] Where, as here, a market price "resulting from actual transactions in the country in question," i.e., the PRC, is unavailable, Commerce turns to a "world market price." Id. § 351.511(a)(2)(i)–(ii). The parties submitted two datasets for Commerce to consider in calculating a world market price for solar glass: IHS from JA Solar and GTA from SolarWorld. Commerce's regulations provide that, "[w]here there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability." Id. § 351.511(a)(2)(ii).

In assessing the utility of each dataset, Commerce weighed four factors: (1) specificity to the input, solar glass; (2) contemporaneity with the period of review ("POR"); (3) units of measure; and (4) exclusivity of taxes and PRC prices. Final I&D Memo at 20–22. In the opinion below, the court found Commerce's analysis deficient, particularly as concerned IHS data, and directed Commerce to address the following on remand: "the possible inclusion of taxes in the IHS data . . . Commerce must explicitly weigh this possible flaw and the IHS data's other potential inaccuracy of reporting a single annual price, against the GTA data's defect of

---

[3] Commerce first attempts to identify a tier-one market price, or "benchmark," which is one "resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). If a price from actual transactions is unavailable, Commerce turns to a tier-two benchmark, in which Commerce "compar[es] the government price to a world market price." Id. § 351.511(a)(2)(ii). For both tier-one and tier-two benchmarks, "[Commerce] will adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product." Id. § 351.511(a)(2)(iv). No party challenges Commerce's recourse to a tier-two benchmark for solar glass. Remand Results at 7. Parties likewise do not contest that Commerce properly adjusted the comparison price to reflect the price the firm would have paid had it imported the product. 19 C.F.R. § 351.511(a)(2)(iv). See Changzhou, 255 F. Supp. 3d at 1316.

being slightly less specific than the IHS data." Changzhou, 255 F. Supp. 3d at 1326.[4]

Commerce's Remand Results accordingly reassessed the IHS data's tax exclusivity, the contemporaneity of both IHS and GTA data with the POR, and the relative product specificity of both IHS and GTA data. Remand Results at 6–14. Commerce concluded that the IHS data is tax-exclusive. Id. at 15. It furthermore conceded that IHS data is deficient in providing only annual figures, but noted that GTA data is deficient in incorporating price data for non-solar glass, and concluded that each deficiency would be mitigated by averaging both datasets. Id. at 15–16. For the following reasons, the court concludes that Commerce's determinations are supported by substantial evidence and its approach is in accordance with the law.

    A.    **Tax Exclusivity of IHS Data**

Commerce used IHS data from 2013 in calculating an average world market price. 2014 IHS Report at 1; Final I&D Memo at 19–22. On remand, Commerce reopened the record, introduced a 2017 IHS report containing data from 2016, and allowed parties the opportunity to "rebut, clarify, or correct" the 2017 report. Remand of 2nd (2013) Administrative Review of the Countervailing Duty Order on Solar Cells from the PRC, C-570-980, POR 01/01/2013-12/31/2013, at 2 (Dep't Commerce Aug. 24, 2017) ("2017 IHS Report"). Neither party submitted responsive factual information. Remand Results at 5. Commerce relied on the following statement in the 2017 report to conclude that IHS data for 2013 is tax-exclusive: "All . . . pricing data presented in this report are calculated using a [[          ]] methodology [[

---

[4] As used by Commerce, both sets were exclusive of PRC prices. Changzhou, 255 F. Supp. 3d at 1321 n.4 (citing Final I&D Memo at 22 (stating that Commerce adjusted IHS data to account for PRC prices)).

]]. As such, .

. . prices . . . are those generated by the manufacturer [[

]]." 2017 IHS Report at 3 (emphasis added).

SolarWorld does not dispute that the above passage suggests that prices in the 2017 IHS Report are tax-exclusive. Furthermore, as observed by Commerce, [[

]] prices listed for 2013 are identical in the 2014 and 2017 reports. Compare 2017 IHS Report at 10, 16, with 2014 IHS Report at 1, 18. The 2017 IHS Report unequivocally indicates that "[a]ll . . . pricing data presented in this report" reflect manufacturing costs. 2017 IHS Report at 3. If all pricing data in the 2017 IHS Report are pre-tax figures, the historical pricing data therein must be tax-free. As the historical pricing data for 2013 is identical in both IHS reports, it logically follows that the 2013 pricing data in the 2014 IHS Report reflects tax-free figures. This alone supplies substantial evidence for Commerce's conclusion.

SolarWorld's arguments against reliance on the 2017 IHS Report are unpersuasive. First, SolarWorld challenges the reasonableness of relying on a report outside the POR. SolarWorld Cmts. at 5. The court finds no reason to preclude all recourse to post-POR reports to clarify matters of methodology, where indicia of year-to-year consistency exist. In addition to the numerical consistencies noted above, a number of pages from the 2014 and 2017 editions are identical, i.e., [[

]] Compare 2017 IHS Report at 6–9; with 2014 IHS Report at 4–5, 9–10. The pages for "Solar Glass–Price Analysis"

**PUBLIC VERSION**
Court No. 16-00157                                                                                                       Page 9

are similarly structured, with updated numbers for 2014 and beyond.[5]  Compare 2017 IHS Report at 10; with 2014 IHS Report at 18.

The purpose of these reports is to forecast and identify trends over time, specifically the 2010-2018 period in the case of the 2017 IHS Report.  2017 IHS Report at 3.  SolarWorld conjectures, without evidence, that IHS may have adjusted its methodology in the intervening 2015 or 2016 reports.  SolarWorld Cmts. at 8.  In addition to the lack of evidence, the court considers that the trend-identifying purpose of the 2017 IHS Report suggests a likelihood that changes or updates to historical data would be indicated.  The IHS reports' identical figures for the year 2013, for example, further suggest that the same method was applied in both reports on record.  Accordingly, the court concludes that Commerce acted reasonably and in accordance with law in drawing its conclusions regarding the figures contained in the 2014 IHS Report based on the 2017 IHS Report.

      **B.**    **Contemporaneity: Annual IHS Figures vs. Monthly GTA Figures**

On remand, Commerce challenged the court's earlier statement that the price of solar glass fluctuates from month-to-month, but Commerce did not directly answer the court's question of whether or not the "annual" prices in the 2014 IHS Report are averages of monthly values, or a narrower data point.  Remand Results at 10–13, 16–20.  See also Final I&D Memo at 21.  Rather, Commerce concluded that, considering the methods by which the IHS report was prepared, which suggest some broader data collection, the greater product specificity of the IHS

---

[5] The above-cited passage of the 2017 IHS Report comes from that report's "Introduction" section.  The record excerpt of the 2014 IHS Report does not include the "Introduction" section.  Compare 2017 IHS Report at 3; with 2014 IHS Report at 1–17.

PUBLIC VERSION
Court No. 16-00157                                                                                                               Page 10

data, and the use of the IHS Report by [[    ]] industry subscribers, the single annual price does not require excluding the IHS dataset altogether. Remand Results at 12–13.

Commerce argues that because GTA factored an indeterminate quantity of non-solar glass into its monthly price calculations, monthly changes in the GTA price were not necessarily due to changes in the price of solar glass. Remand Results at 10–11. Even if GTA price fluctuations do not necessarily correlate with proportional changes in solar glass prices, however, the significant annual changes in solar glass prices suggest some degree of sub-annual fluctuation. [[

]] Both parties agree that Commerce's usual practice is to prefer monthly datasets where available. SolarWorld Cmts. at 6; Remand Results at 16–20.

Despite this, Commerce utilized the "annual" prices from the IHS dataset in calculating its benchmark average. On remand, however, SolarWorld has failed to substantiate the existence of a uniform practice prohibiting the use of annual datasets. See SolarWorld Cmts. at 8–9; Remand Results at 16–20. Most cases cited by SolarWorld are easily distinguishable from the instant situation,[6] but Citric Acid from the PRC warrants further discussion. Citric Acid and

---

[6] 2014 Turkey Rebar involved Commerce's selection of a monthly dataset over a quarterly dataset where no issues were identified with regard to the product specificity of the monthly data set. Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination Final Affirmative Critical Circumstances Determination, 79 Fed. Reg. 54,963 (Dep't Commerce Sept. 15, 2014) ("2014 Turkey Rebar"); Issues and Decision Memorandum for the Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination in the Countervailing Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey, C-489-819, POI 01/01/2012-12/31/2012, at VII.A.1 (Dep't Commerce Sept. 8, 2014). This is simply an example of
(continued . . .)

**PUBLIC VERSION**
Court No. 16-00157                                                                                                  Page 11

Certain Citrate Salts From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2011, 79 Fed. Reg. 108 (Dep't Commerce January 2, 2014) ("Citric Acid from the PRC").  There, without addressing petitioner's suggestion that the annual dataset was the only dataset specific to the input in question,[7] Commerce concluded that monthly data from the same HTS chapter was preferable.  Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review: Citric Acid and Certain Citrate Salts; 2011, C-570-938, POR 01/01/2011-12/31/2011, at VII.I.G n.150 and Comment 13.D (Dep't Commerce Dec. 26, 2013) ("Citric Acid I&D Memo.").  Beyond recounting its general preference for monthly figures, however, Commerce did not indicate that annual datasets were per se unusable.  Citric Acid I&D Memo. at Comment 13.D.  That Commerce, in 2017 Rebar from Turkey, relied entirely on an annual dataset in lieu of a monthly dataset, due to, inter alia, specificity problems with the latter, indicates Commerce has made case-by-case, contextual determinations.

> [T]he Department continues to use the IEA annual data for purposes of calculating a benefit for this program. Although the Department has an established preference for monthly benchmark information, the GTIS data on the record of this investigation is reported in several different units . . . and,

---

Commerce exercising its recognized preference for monthly datasets, all else being equal.  2010 Kitchen Shelving from the PRC does not feature significant discussion of the relative merits of annual and monthly data.  Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2010, 78 Fed. Reg. 21,594 (Dep't Commerce Apr. 11, 2013) ("2010 Kitchen Shelving from the PRC"); Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review: Certain Kitchen Appliance Shelving and Racks from the People's Republic of China, C-570-942, POR 01/01/2010-12/31/2010, at VI.A.6 (Dep't Commerce Apr. 5, 2013).

[7] From the petitioner's comments:  "In this case, the annual India data are the only benchmark specific to limestone flux and would represent the most accurate information on which to calculate the LTAR for limestone flux."  Citric Acid I&D Memo. at Comment 13.D.

> furthermore, implies widely variable natural gas conversion factors . . . Additionally, the specific facts on the record of this investigation demonstrate that the GTIS data includes shipments of compressed natural gas (CNG).

Issues and Decision Memorandum for the Final Affirmative Determination in the Countervailing Duty Investigation of Steel Concrete Reinforcing Bar from the Republic of Turkey, C-489-830, POI , at VII.A.1 and VIII.Comment.4 (Dep't Commerce May 15, 2017). See also Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Affirmative Countervailing Duty Determination, 82 Fed. Reg. 23,188 (Dep't Commerce May 22, 2017) ("2017 Rebar from Turkey"). Commerce's use of IHS data fits within this pattern. The GTA data appears less flawed than the monthly dataset at issue in 2017 Rebar from Turkey, but instead of ignoring the GTA data entirely, as it did with the monthly data in 2017 Rebar from Turkey, Commerce has here chosen to average monthly GTA data with annual IHS data.

Commerce determined that the following suggested the IHS Report's annual figures were reliable: (1) the report was prepared by "[[

]]"; (2) it incorporates "[[

]]"; (3) and its "main targeted audience [[

]]. Remand Results at 11–12 (quoting 2017 IHS Report at 3–4). The foregoing suggests product specificity and professionalism in the report's preparation, but offers no indication of exactly how IHS calculated its annual figures. The report further indicates that all research and analysis of 2016 price data took place "[[

]]," but that "[[

**CONFIDENTIAL INFORMATION OMITTED**

PUBLIC VERSION
Court No. 16-00157                                                                                                    Page 13

]]."

2017 IHS Report at 4 (emphasis added).  This suggests that these annual solar glass prices reflect some sort of averaging, although IHS' input data was imperfect for Commerce's purposes.

Commerce's dual conclusions that the IHS dataset's reliance on annual figures constitutes a deficiency, but that this flaw does not, by itself, make the IHS data unusable are, in these circumstances, supported by substantial evidence.

### C. Relative Product Specificity of the IHS and GTA Datasets

On remand, Commerce continued to find that GTA data exhibited insufficient product specificity, "contrary to Commerce's stated preference to utilize the narrowest category of products encompassing the input product (i.e., solar glass)."  Defendant's Response to Comments Regarding the Remand Redetermination, ECF No. 60, at 7.  The GTA data on record covered Harmonized Tariff Schedule ("HTS") Subheading 7007.19:  Safety glass, consisting of toughened (tempered) or laminated glass: Other.[8]  See, e.g., GTA Data at 5.

The 2014 IHS Report, on the other hand, isolates price figures for solar glass, and distinguishes toughened (tempered) glass from solar glass as follows:  [[

---

[8] The GTA data covers HTS Subheading 7007.19.  For the relevant period, HTS Heading 7007 was divided as follows:
7007    Safety glass, consisting of toughened (tempered) or laminated glass
    7007.11.00    Of size and shape suitable for incorporation in vehicles, aircraft, spacecraft or vessels
        10    For motor vehicles of chapter 87
        90    Other
    7007.19.00    Other
U.S. INT'L TRADE COMM'N, HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES (2013), Section 70, at 7.

]]   2014 IHS Report at 4.  This bolsters Commerce's earlier observation that solar glass is a more specialized category by virtue of its physical characteristics, including solar glass' low iron content and thickness.  See <u>Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2013</u>, C-570-980, POR: 01/01/13-12/31/13, at 32 (Dep't Commerce Dec. 31, 2015).[9]

SolarWorld argues that the vast majority of solar glass nevertheless falls under HTS Subheading 7007.19, SolarWorld Cmts. at 10; as Commerce notes, however, the relevant question for determining the product specificity of data tied to HTS Subheading 7007.19 is whether solar glass constitutes a significant percentage of all products entered under HTS Subheading 7007.19.[10]  <u>Remand Results</u> at 22.  Absent such information, and considering the

---

[9] [[

]]

[10] [[

(continued . . .)

CONFIDENTIAL INFORMATION OMITTED

PUBLIC VERSION
Court No. 16-00157                                                                                                       Page 15

unique physical characteristics of solar glass, Commerce's determination that the monthly GTA data is deficient as concerns product specificity, is therefore supported by substantial evidence.[11] Nevertheless, no party argues, and the record does not suggest, that this deficiency precludes all usage of the GTA dataset.

In sum, the IHS and GTA datasets each have one significant, albeit nonfatal flaw. Neither is unusable, but neither satisfies all of Commerce's factors. Absent a dataset which satisfies all four factors, the court concludes that Commerce's decision to average two imperfect datasets was in accordance with law. See 19 C.F.R. § 351.511(a)(2)(ii).

---

]] though Commerce previously described tempered glass as a "relatively limited category." Remand Results at 8.

[11] U.S. Customs rulings further suggest the breadth of products covered by HTSUS Subheading 7007.19, which had been held to include, for example, glass table tops and lamp parts by the time the GTA data on record was being compiled. Re: The tariff classification of two glass table tops from Indonesia, No. NY J87742 (Customs), 2003 WL 22357214 (U.S. Customs Service Sept. 9, 2003); Re: Clear soda lime tempered cover glass lenses; Lamp parts; chapter 70; heading 8539; EN 70.07; Additional U.S. Rule of Interpretation 1(c), No. HQ 956914 (Customs), 1995 WL 908516 (U.S. Customs Service, Mar. 15, 1995) (importer sought classification under subheading 8539.90.00, but the subject lamp parts were instead classified under subheading 7007.19.00).

PUBLIC VERSION
Court No. 16-00157                                                                                                    Page 16

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's <u>Remand Results</u>. Judgment will enter accordingly.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: March 27, 2018
        New York, New York